CALDWELL LESLIE & PROCTOR, PC
DAVID K. WILLINGHAM, State Bar No. 198874
  *willingham@caldwell-leslie.com*
ROBYN C. CROWTHER, State Bar No. 193840
  *crowther@caldwell-leslie.com*
JENNIFER LEE HONG, State Bar No. 263635
  *hong@caldwell-leslie.com*
725 S. Figueroa Street, 31st Floor
Los Angeles, California  90017-5524
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

Attorneys for FREEDOM
TELECOMMUNICATIONS, INC.

FILED
CLERK, U.S. DISTRICT COURT

DEC - 7 2012

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| FREEDOM TELECOMMUNICATIONS, INC., a California corporation; <br><br> Plaintiff, <br><br> v. <br><br> 360NETWORKS (USA), INC., a Nevada corporation, <br><br> Defendant. | Case No. CVI 2 10509 DSF (AGRx) <br><br> **COMPLAINT FOR:** <br><br> **(1) BREACH OF CONTRACT** <br> **(2) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** <br> **(3) PROMISSORY ESTOPPEL** <br> **(4) DECLARATORY RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

CALDWELL
LESLIE &
PROCTOR

## NATURE OF THE ACTION

1.     Freedom Telecommunications, Inc. ("Freedom") and 360networks (USA), Inc. ("360networks") are telecommunications providers in the business of developing fiber optic networks.

2.     Plaintiff Freedom is a local-access provider based in Southern California.  It constructs and develops "short haul," unmanaged "dark fiber" optic networks that can deliver connectivity to commercial and carrier locations, cellular towers, and other sophisticated end-users in local and regional areas.

3.     Upon information and belief, Defendant 360networks is a full-service provider of fiber optic network and telecommunications services.  It constructs and develops "long haul" networks connecting major metropolitan centers.

4.     Freedom and 360networks enjoyed a mutually successful business relationship based upon their shared desire for complementary growth in Southern California's fiber optics market.  The parties entered into several contracts to develop and share fiber optic network systems, as well as to exchange with each other indefeasible rights of use to certain dark fibers for set terms.

5.     Among those contracts is the Reciprocal Indefeasible Right of Use Agreement (the "IRU Agreement" or the "Agreement").  (Attached hereto as Exhibit 1.)

6.     The IRU Agreement provided generally for the exchange between Freedom and 360networks of indefeasible rights of use to certain dark fibers in cables owned or leased by each party for a set term to run for at least 25 years from March 25, 2011.  Accordingly, Freedom holds indefeasible rights of use to fibers under the IRU Agreement (the "Freedom Fibers").

7.     Among other rights, the IRU Agreement gives Freedom the right to have its lateral or other fibers spliced with the Freedom Fibers at designated access points as specified in the IRU Agreement and/or otherwise provided by 360networks.

CALDWELL
LESLIE &
PROCTOR

-1-

8.     Each party previously satisfied the applicable conditions and obligations set forth in the IRU Agreement.

9.     Freedom seeks to exercise its right under the IRU Agreement to have its laterals or other fibers spliced with the Freedom Fibers at certain designated Access Points so that Freedom can create new interconnects for its customers.  To that end, Freedom has repeatedly requested that 360networks satisfy its contractual obligation to provide access to the Access Points, or to conduct certain requested splicing work on the Freedom Fibers at those Access Points on Freedom's behalf and at its cost.

10.    Freedom has complied with all requirements under the IRU Agreement, including providing timely notice to 360networks of Freedom's splice requests.

11.    360networks has admitted to Freedom that the IRU Agreement continues to bind itself and Freedom.  In fact, in a testament to the validity and the continued binding effect of the IRU Agreement, 360networks is currently transmitting data on behalf of its customers over the dark fibers that Freedom provided to 360networks under the IRU Agreement.

12.    Notwithstanding those facts, 360networks has breached the contractual obligations it owes to Freedom by deliberately and unreasonably denying Freedom's requests for splice work on the Freedom Fibers at the designated Access Points.

13.    360networks has acted in bad faith by denying Freedom's requests, and 360networks' acts of breach have deprived Freedom of the benefit of its bargain.

14.    360networks' acts of breach have also caused Freedom to suffer substantial injury and irreparable harm to its business and to its goodwill.

15.    360networks' acts of breach also pose an imminent risk of disrupting the business activities of Freedom's customers, who rely upon the Freedom Fibers to conduct their own businesses.  Moreover, 360networks has put Freedom at serious risk of liability for Freedom's inability to fulfill its contractual obligations to

CALDWELL
LESLIE &
PROCTOR

1    its customers including, but not limited to, establishing contracted-for interconnects

2    to the Freedom Fibers.

3    **PARTIES**

4    16.    Plaintiff FREEDOM TELECOMMUNICATIONS, INC. is, and at all

5    times relevant herein was, a California corporation with its principal place of

6    business in Marina del Rey, California.

7    17.    Freedom is informed and believes, and on that basis alleges that,

8    Defendant 360NETWORKS (USA), INC. is a Nevada corporation that operates as a

9    subsidiary of 360networks Corporation, with its principal place of business in

10   Seattle, Washington.

11   **JURISDICTION AND VENUE**

12   18.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)

13   because the parties are citizens of different states and the amount in controversy

14   exceeds $75,000, exclusive of interest and costs.

15   19.    Venue is proper in the Central District of California under 28 U.S.C.

16   § 1391(b) because 360networks resides here by virtue of having contacts sufficient

17   to subject them to personal jurisdiction in this District and because a substantial part

18   of the events or omissions giving rise to the claims occurred here.

19   20.    Additionally, the IRU Agreement contains a forum selection clause

20   designating the Central District of California as the forum for all actions and

21   proceedings arising out of or related to the IRU Agreement, and each party to the

22   IRU Agreement agreed to personal jurisdiction in this Court.

23   **FACTUAL ALLEGATIONS**

24   21.    Freedom and 360networks executed the IRU Agreement on March 29,

25   2011.

26   22.    The IRU Agreement provides generally for the following:  (i) the

27   reciprocal grant by each party to the other of indefeasible rights of use in certain,

28   specifically-designated dark fibers; (ii) an IRU term of 25 years with two 5 year

CALDWELL
LESLIE &
PROCTOR

1  renewal terms to be automatically extended unless the IRU grantee provides

2  requisite notice of its intention not to extend beyond the current term; and (iii) the

3  IRU grantee's right to have laterals or other fibers spliced into the dark fibers at

4  designated Access Points as defined and specified in the IRU Agreement.

5          23.     Specifically, the IRU Agreement provides that an IRU grantee may

6  have its lateral or other fibers spliced into the dark fibers at certain "Access Points,"

7  as defined in the IRU Agreement.  While the splicing work itself may be conducted

8  by the IRU grantor, the IRU grantor does not have the discretion to deny the IRU

9  grantee's request so long as the request is timely made and the IRU grantee bears

10  the cost of splicing.

11         24.     The IRU grantor may deny the splice work request in its sole discretion

12  *only* where "the IRU [g]rantee desires future expansion at splice points that are *not*

13  designated Access Points hereunder[.]"  (Exh. 1, § 7.2 (emphasis added).)

14         25.     "Access Point" is defined in the IRU Agreement to include all of the

15  locations specifically set forth in Exhibits A-1 and A-2 to the Agreement.  (*Id.*,

16  Definitions ¶ C.)  Exhibit A-2 sets forth the "Description of Fibers Supplied by

17  360networks to FREEDOM[.]"  In Exhibit A-2, 360networks expressly defines

18  "Access Points" to include, among other locations, "Existing Splice Points or other

19  mutually agreed upon Access Points or Interconnection Manholes."  360networks

20  further provided Freedom with information depicting 360networks' "Existing splice

21  locations" within the meaning of Exhibit A-2.

22         26.     The IRU Agreement provides that "[n]either party shall be in default

23  under this Agreement unless and until the other party shall have given the defaulting

24  party written notice of such default and the defaulting party shall have failed to cure

25  the default within thirty (30) days after written receipt of such notice[.]"  (*Id.*,

26  § 16.1.)

27         27.     The IRU Agreement further provides that "[u]pon the failure by the

28  defaulting party to timely cure any default after notice thereof from the non-

CALDWELL
LESLIE &
PROCTOR

-4-

1   defaulting party, the non-defaulting party may pursue one or more of the following

2   remedies:  a) take such actions as it determines, in its sole discretion, to correct the

3   default and recover reasonable costs incurred in such curing; b) suspend

4   performance under the Agreement . . . c) pursue any legal remedies it may have

5   under applicable law or principles of equity relating to such default, including an

6   action for damages, specific performance and/or injunctive relief." (*Id.*, § 16.3.)

7         28.    The IRU Agreement further provides that:

8             [t]he parties acknowledge and agree that irreparable

9             damage would occur in the event that any of the

10            provisions of this Agreement were not performed in

11            accordance with their specific terms or were otherwise

12            breached.  It is accordingly agreed that each party shall be

13            entitled to injunctive or similar preliminary relief to

14            prevent or cure breaches of the provisions of this

15            Agreement by the other and to enforce specifically the

16            terms and provisions hereof, this being in addition to any

17            other remedy to which they may otherwise be entitled

18            hereunder by law or equity.

19  (*Id.* § 16.4.)

20        29.    On May 18, 2011, Freedom requested in writing that 360networks

21  provide access for splice work on the Freedom Fibers, or conduct the splice work on

22  Freedom's behalf, at designated Access Points under the IRU Agreement.  Freedom

23  requested this splice work in order to create interconnects between the Freedom

24  Fibers and other fibers in Freedom's lateral cables.  Freedom provided timely notice

25  of its expedited request within the time frame set forth in the IRU Agreement, and

26  further provided 360networks with the precise details regarding Freedom's request.

27        30.    360networks failed to respond to Freedom's timely request.

28

CALDWELL
LESLIE &
PROCTOR

1      31.    As a result, on June 19, 2012, Freedom reiterated its request to

2  360networks by written correspondence.

3      32.    On June 22, 2012, 360networks admitted to Freedom in writing that it

4  does not dispute the existence and continued binding effect of the IRU Agreement.

5  360networks further claimed that it would "of course honor the interconnect access

6  request relating to the IRU Agreement as addressed in [Freedom's] May 18, 2012

7  letter on this subject."

8      33.    Notwithstanding that representation, however, 360networks did not

9  provide access for splice work on the Freedom Fibers, nor did 360networks conduct

10  that splice work on Freedom's behalf.

11      34.    On October 15, 2012, Freedom provided 360networks with written

12  notice of the fact that 360networks had still not provided the requested access for the

13  splice work.  Additionally, Freedom further requested that 360networks provide

14  access for further splice work on the Freedom Fibers at additional designated Access

15  Points under the IRU Agreement.  360networks did not respond.

16      35.    Freedom provided written notice to 360networks of its default under

17  the IRU Agreement on November 7, 2012.

18      36.    After various delay tactics, 360networks finally agreed to conduct

19  certain splice work on Freedom's behalf at only two of the designated Access Points

20  identified in Freedom's request.

21      37.    In breach of the IRU Agreement, 360networks denied outright the

22  access request for splice work at four other designated Access Points identified in

23  Freedom's request.

24      38.    360networks' denial is based on the incorrect contention that Freedom

25  has requested splice work at splice points that are not designated Access Points

26  under the IRU Agreement.

27      39.    Freedom has provided 360networks with evidence that the rejected

28  splice work corresponds to four locations that 360networks itself previously

CALDWELL
LESLIE &
PROCTOR

-6-

1   identified to Freedom as "Existing Splice Points or other mutually agreed upon

2   Access Points or Interconnection Manholes" pursuant to Exhibit A-2 of the IRU

3   Agreement.  (Attached hereto as Exhibit 2.)  Accordingly, those four locations are

4   all "Access Points" as defined in the IRU Agreement and Exhibit A-2.

5        40.    360networks, however, continues to refuse to fulfill its contractual

6   obligations.  Freedom, at all times, has given timely notice to 360networks of its

7   splice requests and it has been ready, willing, and able to pay all costs associated

8   with the splice work to the extent required by the IRU Agreement.

9        41.    360networks' words and actions amount to a rejection of the

10  contractual obligations it owes to Freedom under the IRU Agreement, and evince its

11  definite intention not to perform.  Accordingly, 360networks has breached material

12  terms of the Agreement.

13       42.    Due to 360networks' breach, Freedom cannot complete work on behalf

14  of its current clients, who contracted with Freedom to create new interconnects to

15  the Freedom Fibers.  Freedom's inability to timely deliver on its contractual

16  obligations to its customers has caused Freedom to suffer significant harm to its

17  business reputation, client relationships, and goodwill.

18       43.    Major customers who depend upon the Freedom Fibers have repeatedly

19  inquired into Freedom's inability to complete contracted-for interconnects.  As a

20  result of 360networks' breach, Freedom cannot complete that work and thus risks

21  losing those customers' accounts and jeopardizing its business.

22       44.    Additionally, Freedom is precluded from attracting and competing for

23  new clients because it does not have the access to the Freedom Fibers needed to

24  service those clients.

25       45.    Freedom has also incurred substantial, non-refundable costs for

26  construction related to its planned interconnects to the Freedom Fibers.  Because of

27  360networks' breach, Freedom cannot complete those interconnects and cannot

28  recover the costs that it has already expended in reliance upon the interconnects.

CALDWELL
LESLIE &
PROCTOR

46.     Further, Freedom is required by contracts with third parties to pay recurring monthly fees to continue to lease and maintain certain infrastructure associated with the Freedom Fibers.  Freedom continues to pay those substantial fees notwithstanding the fact that it is unable to generate additional revenue from its use of the Freedom Fibers due to 360networks' refusal to perform its obligations under the IRU Agreement.  Due to this ongoing cost liability, Freedom is limited in its ability to grow its business by investing in other projects and developments.

## FIRST CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

47.     Freedom realleges each and every allegation set forth in Paragraphs 1 through 46 and incorporates them herein by reference.

48.     Freedom entered into the IRU Agreement with 360networks as alleged *supra* with the justified expectation that 360networks, a party to the Agreement, would honor material terms set forth in the Agreement.  Those terms include, but are not limited to, providing Freedom with access to designated Access Points, or conducting splice work on Freedom's behalf, to complete interconnects between the Freedom Fibers and other fibers or laterals owned or used by Freedom.

49.     In consideration thereof, Freedom granted 360networks with indefeasible rights of use to dark fibers in cables owned or leased by Freedom.  Upon information and belief, to date, 360networks continues to use those fibers and enjoy the full benefits of its use.

50.     Freedom has fulfilled all of its obligations under the IRU Agreement.

51.     360networks has breached its obligations under the IRU Agreement.  360networks has denied Freedom's repeated requests for 360networks to provide Freedom with access to designated Access Points, or to conduct splice work on Freedom's behalf at those Access Points.  360networks is contractually obligated to permit such splice work.

CALDWELL
LESLIE &
PROCTOR

52.     Accordingly, 360networks is in default under the IRU Agreement, and it has failed to timely cure its default following Freedom's written notice.

53.     360networks' actions constitute a material breach of the Contract.  Its acts have harmed Freedom and precluded Freedom from obtaining the benefit of Freedom's bargain.

54.     By engaging in the conduct described herein, 360networks has been unjustly enriched at the expense of Freedom.  As a direct and proximate result of 360networks' acts, Freedom has had to materially change its position, and it has suffered, and will continue to suffer irreparable harm to its business and goodwill.

## SECOND CLAIM FOR RELIEF

## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

55.     Freedom repeats and realleges each and every allegation contained above, as though fully set forth herein.

56.     The IRU Agreement contains an implied covenant of good faith and fair dealing on the part of 360networks.  The implied covenant requires, among other things, that 360networks treat Freedom fairly and in good faith, and do nothing to deprive Freedom of the benefits of the Agreement and/or to frustrate the agreed-upon purposes of the Agreement.

57.     360networks breached the implied covenant of good faith and fair dealing, and acted in bad faith, by denying Freedom's repeated requests for 360networks to provide Freedom with access to, or to conduct splice work on Freedom's behalf, at designated Access Points under the IRU Agreement.

58.     Because of 360networks' conscious, deliberate, and objectively unreasonable conduct rooted in bad faith, Freedom has not obtained the reasonably expected benefit of its bargain.  The essential purpose of the Agreement has been unfairly frustrated.

59.     As a direct and proximate result of 360networks' breach of the covenant of good faith and fair dealing as described herein, Freedom has had to

CALDWELL
LESLIE &
PROCTOR

-9-

1 | materially change its position, and it has suffered, and continues to suffer, injury in

2 | fact, actual damages, and loss of goodwill.

3 | **THIRD CLAIM FOR RELIEF**

4 | **(PROMISSORY ESTOPPEL)**

5 | 60.     Freedom repeats and realleges each and every allegation contained

6 | above, as though fully set forth herein.

7 | 61.     The IRU Agreement between Freedom and 360networks contains a

8 | clear, unambiguous promise to Freedom that it would be entitled to indefeasible

9 | rights of use to the Freedom Fibers for the contracted-for term, including the right to

10 | create lateral or other connections to the Freedom Fibers at designated Access

11 | Points.

12 | 62.     Freedom reasonably and foreseeably relied on those promises.  In

13 | exchange, Freedom granted to 360networks indefeasible rights of use to fibers in

14 | cables that Freedom owns or leases, with all of the benefits that inure to the IRU

15 | grantee under the Agreement.

16 | 63.     Freedom has suffered and continues to suffer substantial detriment and

17 | injury in fact due to its reliance upon the clear promises set forth in the Agreement.

18 | 64.     360networks' acts have caused, and are continuing to cause, irreparable

19 | injury to Freedom, for which Freedom has no adequate remedy at law, and

20 | 360networks will continue to do so unless enjoined by this Court.

21 | **FOURTH CLAIM FOR RELIEF**

22 | **(DECLARATORY RELIEF)**

23 | 65.     Freedom repeats and realleges each and every allegation contained

24 | above, as though fully set forth herein.

25 | 66.     The parties dispute whether 360networks has breached its obligations

26 | under the IRU Agreement.  As such, an actual and present controversy exists

27 | between Freedom and 360networks.

28 |

CALDWELL
LESLIE &
PROCTOR

67.     Freedom contends that it has fulfilled all of its obligations under the Agreement, but that 360networks has breached its obligations by denying Freedom's repeated requests for 360networks to provide Freedom with access to, or to conduct splice work on Freedom's behalf, at designated Access Points under the IRU Agreement.

68.     Freedom seeks a judicial declaration of the respective and relative legal rights and duties of each of the parties to the Agreement, including a determination of the parties' respective obligations arising under them.

## PRAYER FOR RELIEF

WHEREFORE, Freedom respectfully requests that the Court enter judgment against 360networks as follows:

1.     Enter declaratory judgment in Freedom's favor, determining the IRU Agreement's binding effect on the parties, and setting forth the parties' respective legal rights and obligations pursuant to the Agreement.

2.     Enter a permanent injunction enjoining 360networks from continued breach of the IRU Agreement, and further enjoining 360networks and its officers, directors, agents, employees, representatives, and all other persons or entities acting in concert or participation with 360networks, from failing to provide Freedom with access to the Freedom Fibers at the designated Access Points under the IRU Agreement, or failing to conduct splice work on Freedom's behalf and at its cost as provided for in the IRU Agreement;

3.     Award Freedom monetary damages for the harm that it has suffered and continues to suffer as a result of 360networks' acts, in an amount to be proven at trial, as well as pre-judgment and post-judgment interest;

4.     Enter an award of attorneys' fees and costs;

/ / /

/ / /

/ / /

CALDWELL
LESLIE &
PROCTOR

1   5.  Award any such other and further relief as this Court deems just and

2 proper.

3 DATED: December 7, 2012    Respectfully submitted,

4

5             CALDWELL LESLIE & PROCTOR, PC
               DAVID K. WILLINGHAM

6             ROBYN C. CROWTHER
               JENNIFER LEE HONG

7

8

9             By

10              DAVID K. WILLINGHAM
              Attorneys for FREEDOM

11             TELECOMMUNICATIONS, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALDWELL
LESLIE &
PROCTOR

-12-

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, Plaintiff

3  Freedom Telecommunications, Inc. hereby demands a jury trial.

4

5  DATED:  December 7, 2012          Respectfully submitted,

6                                                      CALDWELL LESLIE & PROCTOR, PC
7                                                      DAVID K. WILLINGHAM
                                                        ROBYN C. CROWTHER
8                                                      JENNIFER LEE HONG

9

10

11  By _____
12          DAVID K. WILLINGHAM
      Attorneys for FREEDOM
13  TELECOMMUNICATIONS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALDWELL
LESLIE &
PROCTOR

-13-

## RECIPROCAL INDEFEASIBLE RIGHT OF USE AGREEMENT

**THIS RECIPROCAL IRU AGREEMENT** ("**Agreement**") is made, entered into, and effective as of the 29ᵗʰ day of _March_, 2011 by and between 360networks (USA) inc., a Nevada corporation ("360"), having an office at 370 Interlocken Boulevard, Suite 600, Broomfield, CO 80021, and Freedom Telecommunications, Inc., a California corporation ("Freedom"), having an office at 4505 Glencoe Avenue, Marina del Rey, CA 90292, each referred to individually as "Party", and 360 and Freedom being collectively referred to as the "Parties"

### DEFINITIONS:

In addition to any terms defined herein, the following terms used in this Agreement shall have the following meanings:

A.      "**Acceptance**" means the issuance of an Acceptance Notice or failure to issue a notice of defective IRU Fibers within ten (10) days after receipt of OTDR test results pursuant to Article III herein.

B.      "**Acceptance Notice**" means the notice of acceptance or deemed acceptance of a Segment and/or entire route given pursuant to Article III herein.

C.      "**Access Point**" is the physical location(s) at which the IRU Fibers are connected to the telecommunications system of the IRU Grantee in accordance with the provisions and restrictions set forth elsewhere in this Agreement. Access Points may be a point of presence, regenerator site, optical amplifier site, Interconnection Manhole or other designated splice point, with each Access Point specifically set forth in **Exhibits A-1 and A-2**, attached hereto and incorporated by reference herein

D.      "**Affiliates**" shall have the meaning set forth in Section 15.1.

E.      "**Cable**" means the Cable containing Dark Fibers in which an IRU Grantee has an IRU pursuant to the terms of this Agreement.

F.      "**CPI**" shall mean the Consumer Price Index published by the Bureau of Labor Statistics, United States Department of Labor.

G.      "**Dark Fiber**" means Fiber between two specified locations that has no optronics or electronics attached to it.

H.      Intentionally omitted.

I.      "**Delivery Work**" shall mean all work necessary in order to achieve connectivity and to provide OTDR test results from Access Point to Access Point pursuant to Article III herein.

J.      "**SM**" means Scheduled Maintenance which is a prearranged period of time reserved for certain work on a party's Network that may potentially impact traffic.

K.    **"Effective Date"** shall have the meaning set forth in Section 3.3

L.    **"Fiber"** means a glass strand or strands which is/are protected by a color coded buffer tube and which is/are used to transmit a communication signal along the glass strand in the form of pulses of light.

M.    **"Fiber Optic Cable"** or **"Cable"** means a collection of Fibers contained in color-coded buffer tubes with a protective outer covering, which covering includes stiffening rods and filler

N.    **"Indefeasible Right of Use"** or **"IRU"** is an exclusive and irrevocable right to use certain Dark Fibers in the Cable, subject to the terms and conditions of this Agreement

O.    **"Interconnection Manhole"** is one type of Access Point comprising an existing or newly placed manhole in the Grantor Network. Grantor shall own the Interconnection Manhole and all fibers connecting Grantor's backbone Cable to the Interconnection Manhole subject to Grantee's interest in the IRU Fibers.

P.    **"IRU Fibers"** means the Dark Fibers obtained by each party in the other party's Cable as set forth in **Exhibits A-1 and A-2**.

Q.    **"OTDR"** means Optical Time Domain Reflectometer  A device that measures distance to a reflection surface by measuring the time it takes for a lightwave pulse to reflect from the surface.

R.    **"IRU Grantee"** is a party obtaining IRU Fibers in the Cable of the other party as set forth in **Exhibits A-1 and A-2**. **"IRU Grantor"** is a party granting an IRU to an IRU Grantee.

S.    **"Network"** means the telecommunications system owned or operated by a party.

T.    Reserved

U.    **"Proportionate Share"** means the percentage determined by dividing the total number of a party's IRU Fibers in the other party's Cable or Cables by the total number of Fibers in the Cable or Cables  The Proportionate Share may vary with respect to particular Segments of the Cable.

V.    **"PSWP"** means Plan System Work Period, which is a prearranged period of time reserved for certain work on a party's Network that may potentially impact traffic.

W.    **"Rejection Notice"** means the notice of rejection of a Segment and/or entire route given pursuant to Article III herein.

X.    **"Rights"** means any and all underlying IRU Agreements and any and all necessary right of way agreements, easements, licenses, leases, rights or other agreements necessary for the

Page 2 of 35

**15**
**EXHIBIT 1**

occupancy and use by either party of poles, conduit, cable, wire, physical plant facilities, and/or access to real property underlying the Cable.

Y.     **"Segments"** are portions of Cable routes specified in **Exhibits A-1 and A-2**, which are capable of being tested and accepted.

Z     **"Taxes"** shall have the meaning set forth in Section 9.1.

AA.     **"Term"** means the term of the IRU as set forth in Article II, commencing on the Effective Date of this Agreement

## BACKGROUND

Each party desires to obtain the right to use certain Dark Fibers in the other party's owned or leased Cable, and each party desires to grant to the other party an Indefeasible Right of Use in certain Dark Fibers in its owned or leased Cable, subject to the terms and conditions set forth below.

Accordingly, in consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## FIBER OPTIC USE

1.1     **Grant of IRU**.  Subject to the terms and conditions of this Agreement, each party grants to the other an IRU in certain Dark Fibers as specifically described in **Exhibits A-1 and A-2**. The IRU includes a non-exclusive right to use tangible and intangible property in order to use the IRU Fibers, including but not limited to cable sheathing, troughing, pedestals, slack containers, and related equipment necessary for the operation and use of the IRU Fibers as contemplated herein (collectively, the **"Associated Property"**), but excluding any electronic or optronic equipment which shall be provided by an IRU Grantee at its sole cost.  Upon Acceptance by both parties of their respective IRU Fibers, the parties shall be entitled to use their respective IRU Fibers.  Each party hereby agrees to be bound by all laws, regulations and any requirements of Rights agreements

1.2     **Non-Interference**.  An IRU Grantee shall not use its IRU Fibers in a manner that materially interferes in any way with, or otherwise adversely affects the use of the other party's Network, Fibers, Cable, (or any equipment or element thereof), or of the fiber, cable or equipment of any person along the route Segments

1.3     **IRU Grantor Property**.  IRU Grantee shall not individually or permit others to access, rearrange, disconnect, remove, attempt to repair, or otherwise tamper with any IRU Grantor property without the prior, written consent of IRU Grantor.  The Parties agree that no party other than IRU Grantor or a contractor under the direct supervision of IRU Grantor shall be permitted to perform maintenance or splicing  IRU Grantor property is for use in connection with the

Services and shall not be used for any purpose other than that for which IRU Grantor provided it. In the event that IRU Grantee, or IRU Grantee's representative, agent or any other party associated with IRU Grantee violates this provision, in addition to any other remedies for breach by IRU Grantee, IRU Grantee shall be responsible to pay IRU Grantor for all reasonable damages to IRU Grantor property and also any ongoing service charges in the event that maintenance or inspection of IRU Grantor property is required as a result of IRU Grantee's violation of this provision. In no event shall IRU Grantor be liable to IRU Grantee or any other entity for interruption of Service or for any other loss, cost or damage caused or related to IRU Grantee's unauthorized tampering with the IRU Grantor property. In the event of any violation of this provision, IRU Grantor reserves the right to terminate for cause this Agreement, and IRU Grantee shall forfeit all monies paid to date by the IRU Grantee. IRU Grantee has the right to access the terminal ends of IRU Grantor fiber (jumpers, FDP) at their equipment rack when collocated within an IRU Grantor premise.

## ARTICLE II
## EFFECTIVE DATE AND TERM

2.1 **Effective Date Initial Term and Renewal.** The IRU Term shall start upon the Effective Date and shall terminate twenty-five (25) years after the Effective Date, provided, however, that the Initial Term shall automatically be extended for two (2) additional successive five (5) year renewal terms following the expiration of the Initial Term (or first renewal term, if applicable) unless the Grantee provides at least 90 days before the expiration of the current term written notice to the Grantor of Grantee's election to not extend the term of Grantee's IRU beyond that date for expiration of the current term. In the event one Party wishes to exercise a renewal term for a Grantor's IRU but the other Party does not wish to exercise the same option, the Grantee shall be charged Grantor's standard rates for use of the IRU Fibers.

2.2 **Survival of Certain Obligations.** Expiration or termination of this Agreement shall not affect the rights or obligations of any party with respect to any payments of costs incurred prior to the date of termination.

## ARTICLE III
## ACCEPTANCE AND DOCUMENTATION

3.1 **Acceptance.** An IRU Grantee shall be deemed to have accepted and to be in possession of its IRU Fibers upon the Effective Date pursuant to the procedures set forth below.

3.2 **Test Results.** Within forty five (45) days after execution of this Agreement, each party shall complete any Delivery Work necessary to convey the IRU to the other party, and shall provide Access Point to Access Point OTDR test results incorporating such intermediate test points as may be reasonably required for the IRU Fibers. In addition, an IRU Grantee may perform a visual inspection, subject to the protocols of all Rights agreements, of all above-ground Access Points and visible Cable construction. Within ten (10) days after receiving IRU Fiber test results, an IRU Grantee shall (i) determine whether the IRU Fiber test results conform to the requirements of the Testing and Acceptance Standards attached hereto as **Exhibit B** incorporated by reference herein, and (ii) provide an Acceptance/Rejection Notice in the form of the attached **Exhibit C** incorporated by reference herein. Issuance of an Acceptance Notice or

failure to issue an Acceptance/Rejection Notice within the ten (10) day period shall constitute unconditional and irrevocable Acceptance of IRU Fibers for all purposes under this Agreement by an IRU Grantee as of the 11th day.

3.3     **Acceptance/Rejection Procedure; Effective Date.**   Should an IRU Grantee reject the IRU Fibers by providing a Rejection Notice within the applicable ten (10) day period in accordance with Section 3.2, upon receipt thereof, the other party shall promptly undertake to investigate, and if necessary correct, any deficiency or non-conformity in the IRU Fibers. Thereafter, an IRU Grantor shall again conduct testing of the IRU Fibers from Access Point to Access Point. The foregoing procedure shall apply again and successively thereafter until an IRU Grantor has remedied all defects or failures and has received an Acceptance Notice from the IRU Grantee.

If an IRU Grantee issues a Rejection Notice where an IRU Grantor reasonably believes the IRU Fiber test results conform to the Testing and Acceptance Standards, the parties shall work together to do cooperative testing, sharing the cost equally, to determine whether the test results conform to specifications. In the event that the cooperative testing continues to demonstrate that the IRU Fiber conforms to the Testing and Acceptance Standards, and an IRU Grantee continues to issue a Rejection Notice for forty-five (45) days after an IRU Grantor has made viable IRU Fibers available from Access Point to Access Point, this Agreement shall automatically terminate.

The date of Acceptance by both parties of their respective IRU Fibers shall constitute the **"Effective Date."**

3.4     **Disputes.**   Any disputes as to Acceptance of IRU Fibers shall be resolved in accordance with Article XXI of this Agreement.

3.5     **Record Drawings.**   Upon request, but not before one hundred twenty (120) days after Acceptance, each party shall provide to the other record drawings regarding the as-built Cable containing the respective IRU Fibers and Google Earth files (.kmz or .kml) of the as-built Cable will be provided by each party as of the date of this Agreement. The record drawings shall contain the technical specifications of the Cable, associated splices and other details consistent with industry standards. At the request of an IRU Grantee, and provided IRU Grantee shall bear the reasonable cost of production therefore, the record drawings shall also be provided in electronic format if possible.

## ARTICLE IV
## FRANCHISE/LICENSE/PERMIT FEES, AND COLLOCATION AGREEMENTS

4.1     **Collocation.**   Each party shall be responsible for entering into any collocation agreements with Local Exchange Carriers and Interexchange Carriers to use its IRU Fibers. In

the event that a party wishes to co-locate in the other's facilities, or in facilities owned by any third party as a tenant of the other party, subject to space availability the parties shall make all reasonable efforts to enter into a separate collocation agreement, subject to obtaining any required third party consents  In the event that a party, in its discretion, decommissions any collocation site, such party will not be responsible for any costs associated with removal or relocation of the IRU Grantee's facilities or the IRU Fibers

4.2   **Permits.**  Each party shall be responsible for any government filings, licenses, or other requirements to place its IRU Fibers into operation, including, but not limited to any necessary municipal licenses and/or franchise agreements.

4.3   **Rights Fees.**  Each party shall bear the cost of payment for Rights applicable to its Cable as required from time to time by property owners, government agencies, taxing authorities, or otherwise imposed by law or contract.

## ARTICLE V
## PAYMENT

5.1   **Method of Payment.**  All payments set forth in this Agreement may be made using standard company business practices and, except as otherwise provided herein, are due and payable within thirty (30) days of an IRU Grantee's receipt of invoice.

5.2   **Overdue Payments.**  If an IRU Grantee fails to make any payment under this Agreement when due, such amount shall accrue interest from the date such payment is due until paid, including accrued interest compounded monthly, at an annual rate of twelve percent (12%).  If the aforementioned rate exceeds the maximum rate allowed by applicable law, then the interest rate made applicable herein shall be the maximum rate allowed by law.

5.3   **No Fees for IRU Fibers.**   No IRU Fees will be charged to IRU Grantee for the use of the IRU Fibers as contemplated under this Agreement and its Exhibits unless specifically set forth herein, or in the applicable **Exhibit A-x,** or otherwise agreed to by both Parties in writing.

## ARTICLE VI
## MAINTENANCE AND REPAIR

6.1   **Procedures.**   Each party's escalation and call-out list for maintenance and repair communications is set forth on the attached **Exhibit D** incorporated by reference herein.  Each party shall maintain its Cable in accordance with prevailing telecommunications industry standards, and with the Maintenance Standards set forth in the attached **Exhibit E** incorporated by reference herein.  IRU Grantor shall not charge for, and IRU Grantee shall not be liable for, any maintenance services except for Demand Maintenance as defined in Exhibit E, section 1(b) (iii).  The charge for Demand Maintenance shall be the IRU Grantor's then-standard fees for such services.

6.2   **Routine and Emergency Maintenance**   All routine maintenance and repair functions and emergency maintenance and repair functions, including "one-call" responses, cable locate

services, and necessary relocation of a party's Cable containing the IRU Fibers, shall be performed by such party or its designee for a period coterminous with the term of this Agreement.

(a)     Unscheduled Maintenance.   Each party shall respond to any failure, interruption or impairment in the operation of the IRU Fibers in its Cable within four (4) hours after receiving a report of any such failure, interruption or impairment. Each party shall use all reasonable efforts to perform maintenance and repair to correct any failure, interruption or impairment in the operation of the IRU Fibers in its Cable within eight (8) hours.

(b)     Scheduled Maintenance.   Each party shall schedule and perform periodic maintenance and repair checks and services as set forth in the Routine Maintenance Standards.   Additional maintenance can be performed from time to time at a party's reasonable discretion, or upon an IRU Grantee's request with reasonable advance notice.

6.3   **Notice of Repair**.   Except when, and to the extent to which, implementation of an emergency repair situation would be delayed by the following notice requirement, each Party shall provide advance notice to the other Party of maintenance or repairs that may affect the other Party's IRU Fibers.

(a) Emergency Maintenance.  Each Party shall provide at least two hours advance notice regarding repairs that may affect the other Party's IRU Fibers by calling the IRU Grantee's NOC at the telephone number provided in **Exhibit D.**

(b) Routine Maintenance.  Each Party shall use commercially reasonable efforts to provide at least ten (10) days advance notice regarding any maintenance or repairs that may affect the other Party's IRU Fibers by submitting an email notification to the IRU Grantee's change management team at the address provided in **Exhibit D**. Each party must provide no less than 96 hours advanced notice of any PSWP.

(c) **Notice of PSWP**.  Each party shall use commercially reasonable efforts to provide ten (10 days advance notice for any PSWP affecting its Network by submitting an email notification to the IRU Grantee's change management team at the address provided in **Exhibit D** Each party must provide no less than 96 hours advanced notice of any PSWP.

**ARTICLE VII**
**SPLICING**

7.1   **Party to Perform**.  An IRU Grantee's lateral or other fibers beyond the Access Points may be spliced into the Cable at the Access Points pursuant to the procedures set forth in section 7.2 and in **Exhibit B** attached hereto and incorporated by reference herein. In order to maintain the integrity of a party's Cable and Network, each party, or a contractor operating under its direction, shall perform all splicing performed on the its Cable at the Access Points.

Page 7 of 35

7.2   **Future Work.** If IRU Grantee desires future expansion at splice points that are not designated Access Points hereunder then IRU Grantee must request such future expansion from IRU Grantor. IRU Grantor will grant or deny such request in its sole discretion. The cost for any such splice work will equal the IRU Grantor's cost plus fifteen (15%) for administration and overhead. Normal requests for splicing shall be submitted at least sixty (60) days prior to the requested splicing date, and expedited requests shall be submitted at least thirty (30) days prior to the requested splicing date. Each party agrees that it will not perform any splicing or otherwise interfere in any manner with the other party's Cable at any time for any reason. The cost of splicing will be borne at all times by an IRU Grantee.

## ARTICLE VIII
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGMENTS

8.1   **Representations and Warranties.** Each party represents and warrants to the other with respect to the rights and obligations contained herein:

   (a)   it has the full right and authority to enter into, execute, deliver and perform its obligations under this Agreement;

   (b)   this Agreement constitutes a legal, valid, binding obligation enforceable against such party in accordance with its terms; and

   (c)   its execution of and performance under this Agreement shall not violate any applicable existing regulations, rules, statutes or court orders of any local, state or federal government agency, court or body.

8.2   **Limited Warranty, Disclaimer of Implied Warranties, and Limitation of Damages.** NEITHER PARTY MAKES ANY OTHER WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONDITION OF ITS CABLE OR ITS FIBERS, INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER FOR ANY REASON HEREUNDER.

## ARTICLE IX
## TAXES

9.1   **Definition.** As used in this Article IX, "Tax" or "Taxes" shall mean any and all taxes, fees, assessments, charges, and levies, together with any penalties, fines, or interest thereon, (hereinafter collectively referred to as "Taxes") imposed by any authority having the power to tax, including any city, county, state, or federal government or quasi-governmental agency or taxing authority.

9.2   **Responsibility.** Each IRU Grantee shall be responsible for any and all sales, use, income, gross receipts or other Tax assessed on the basis of revenues received by such party as a

result of the IRU granted hereunder. The IRU Grantor shall be solely responsible for any real or personal property Taxes relating in any way to its Cable, except for any Taxes relating to the IRU Fibers. Property taxes relating to the IRU Fibers will be the responsibility of the IRU Grantee

9.3    **Right to Contest**. Either party may in good faith, contest the imposition of any Tax imposed against them in accordance with this Agreement; provided, however, that the contesting party shall take all steps reasonably necessary to ensure that the non-contesting party's use of its Fibers shall not be impaired, including, but not limited to, depositing the entire contested amount with the taxing authority.

**ARTICLE X**
**LIABILITY**

10.1    **Waiver**. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, ANY CLAIM FROM ANY CUSTOMER FOR LOSS OF SERVICES) ARISING UNDER THIS AGREEMENT OR FROM ANY BREACH OR PARTIAL BREACH OF THE PROVISIONS OF THIS AGREEMENT OR ARISING OUT OF ANY ACT OR OMISSION OF ITS DIRECTORS, OFFICERS, EMPLOYEES, SERVANTS, CONTRACTORS AND/OR AGENTS. Each IRU Grantee shall use every reasonable effort to include in any agreement with any third party relating to the use of its IRU Fibers, a waiver by such third party of any claim for indirect, incidental, special, punitive or consequential damages (including, but not limited to, any claim from any client or customer for loss of services) arising out of or as a result of any act or omission by the party granting the IRU, its directors, officers, employees, servants, contractors and/or agents. NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE FOR ANY DAMAGES (INCLUDING WITHOUT LIMITATION, DAMAGES FOR HARM TO BUSINESS, LOST REVENUES, LOST SAVINGS, OR LOST PROFITS) CLAIMED BY THE OTHER OR ITS END USER CUSTOMERS OR ANY OTHER THIRD PARTY.

10.2    **Indemnity**. To the fullest extent permitted by law but subject to Section 10.1, each Party (the "Indemnitor") shall be liable for and shall defend, indemnify and save harmless the other Party and the other Party's successors and permitted assigns, directors, officers, employees and authorized representatives from and against any and all loss, damage or injury to persons or property and all liabilities, costs, suits, charges, expenses (including reasonable legal fees and expenses), claims, losses, fines, taxes, damages and causes of action in connection therewith of any nature or kind whatsoever made against the other Party by a third party, resulting directly from the Indemnitor's: (i) failure to observe or perform its obligations under this Agreement; or (ii) any wrongful act or omission or negligence of the Indemnitor relating to its use of the IRU Fibers or provision of maintenance services unless where such damages are due to the wrongful act, omission, default or negligence of the Party claiming or suffering the loss, cost or expense.

10.3    **Limitations Period.** The Parties expressly agree that no claim for losses or damages whatsoever in connection with this Agreement shall be made more than two (2) years after the

**22**
**EXHIBIT 1**

date that the event giving rise to such claim is known or reasonably should have been known to the Party making such claim, and no claim for indemnity under the provisions of this Article shall be made more than two (2) years after the first notice of any claim received by the Party claiming under such indemnity provision..

10.4   **Liability Cap.** The maximum liability of either Party to the other Party, if any, in connection with this Agreement shall be limited in the aggregate to two-hundred fifty thousand dollars ($250,000); provided however, that this limitation of maximum liability shall not apply to the indemnity obligations in this Agreement or damages arising from the willful or intentional misconduct of either Party. This limitation of liability shall not restrict either Party's rights to proceed for injunctive relief

10.3   **Actions Against Third Parties**   Nothing contained herein shall operate as a limitation on the right of either party hereto to bring an action for damages, including consequential damages, against any third party based on any acts or omissions of such third party as such acts or omissions may affect the operation or use of its Cable or its IRU Fibers; and each party hereto shall assign such rights or claims, execute such documents and take whatever actions as may be reasonable and necessary to enable the injured party to pursue any such action against such third party.

### ARTICLE XI
### FORCE MAJEURE

The obligations of the parties are subject to force majeure and neither party shall be in default under this Agreement if any failure or delay in performance is caused by strike or other labor dispute; accidents; acts of God; fire; flood; earthquake; lightning; unusually severe weather; material or facility shortages or unavailability not resulting from such party's failure to timely place orders therefor; lack of transportation; legal inability to access property; acts of any governmental authority; government codes, ordinances, laws, rules and regulations or restrictions; condemnation or the exercise of rights of eminent domain; war or civil disorder; or any other cause beyond the reasonable control of either party hereto. The excused party shall use every reasonable effort under the circumstances to avoid or remove such causes of non-performance and shall proceed to perform with reasonable dispatch whenever such causes are removed or ceased. Notification of any such event or cause shall in all cases be given by the excused party to the other and, when possible, of the estimated duration.

### ARTICLE XII
### RELOCATION OF CABLE

12.1   **Relocation.** Except as provided in Article XIV, if after the Effective Date, either party is required to relocate or replace its Cable or any of the appurtenant facilities used or required in providing an IRU, (whether by act of nature, government, or grantor of any Right) then, so long as such work is not necessitated by a breach by the other party, such party shall bear the costs of the relocation, including, without limitation, fiber acquisition, splicing, and testing, including overhead   Each party, upon written request, shall deliver to the other updated record drawings with respect to any relocated portion of the Cable upon request but no earlier than one hundred twenty (120) days following such relocation   Upon completion of any such relocation an IRU

Grantee shall be deemed have an IRU in and to the replacement fibers as set forth in Article I herein.

12.2   **Notice of Relocation**. Each party shall give the other sixty (60) days prior notice of any such relocation, if possible, and shall have the obligation to proceed with such relocation, including, but not limited to, the right to determine the extent of, the timing of, and methods to use for such relocation.

12.3   **Right to Review**. Each party shall have the right to determine the timing, means, method and extent of any relocation of its Cable hereunder; provided however, that an IRU Grantee shall have the right to review the relocation plans thirty (30) days prior to any relocation and shall have the right to have a representative present at the time of the relocation.

**ARTICLE XIII**
**INSURANCE**

13.1   **Insurance**. Each party shall maintain insurance, for the duration of this Agreement, as follows:

    (a)   Workers' Compensation Insurance complying with the law of the state or states in which the services are to be provided and Employers Liability Insurance with the limits of $1,000,000 for each accident, including occupational disease coverage with limits of $1,000,000 for each employee, with a $1,000,000 policy limit.

    (b)   Comprehensive General Liability Insurance, including premises, operations, products and completed operations, contractual, broad form property damage, independent contractors and personal injury with the following minimum limits: $1,000,000 per occurrence, $2,000,000 General Aggregate, $2,000,000 Products and Completed Operations, $1,000,000 Personal Injury CSL (Combined Single Limit).

    (c)   Automobile Liability Insurance for owned, hired and non-owned autos: $2,000,000 combined single limit bodily injury/property damage

    (d)   Excess Liability insurance in an amount not less than $5,000,000.

13.2   **Certificates**. Failure of either party to enforce the minimum insurance requirements listed above shall not relieve the other of the responsibility for maintaining coverages in the aforesaid amounts. Each party shall furnish to the other certificates of insurance reflecting policies carried and limits of coverage as required above, which shall provide or will endeavor to have the issuing insurance company provide at least thirty (30) days advance written notice of cancellation of the policies referenced above. 360networks (USA) inc.'s insurance certificate shall name FREEDOM as an additional insured. FREEDOM's insurance certificate shall name 360networks (USA) inc, as an additional insured

**ARTICLE XIV**
Page 11 of 35

## CONDEMNATION

14.1 **Awards.** In the event any portion of a party's Cable and/or IRU Fiber, or the Rights in or upon which it has been installed, become the subject of a condemnation proceeding by any governmental agency or other party cloaked with the power of eminent domain for public purpose or use, then and in such event, it is agreed that an IRU Grantee's interest (being its Proportionate Share of the Fiber) shall be severed from the other party's interest in such proceeding. Each party shall be entitled to independently pursue an award for its interest in such proceedings and the parties hereto agree to have any such condemnation awards specifically allocated between its interest and the interest of the other. In the event an IRU Grantee's interest in such proceeding cannot be severed from the other's interest, an IRU Grantee shall be entitled to receive its Proportionate Share of the award for its interest in the IRU Fibers and occupancy of the Rights.

14.2 **Notice of Taking.** Upon its receipt of a formal notice of condemnation or taking, each party shall notify the other within (30) days of any condemnation proceeding filed against its Cable, or the Rights in or upon which the IRU Fibers have been installed.

14.3 **Costs.** It is expressly recognized and understood that relocation costs resulting from any such condemnation proceeding may not be fully reimbursed by the condemning authority and, if either party relocates its Cable, the other shall pay its Proportionate Share of all costs associated with the relocation of the IRU Fibers in excess of such costs which were reimbursed by the condemning authority.

## ARTICLE XV
## CONFIDENTIALITY

15.1 **Generally.** Each party shall ensure that any and all information and documents obtained from the other party during the term of this Agreement, and identified as being confidential information, will be held in strict confidence and will not be disclosed or be used for any purpose other than a party's performance required by this Agreement, and except for disclosures to Affiliates, directors, officers, employees, advisors and agents with a bona fide need to know any such information solely for the purpose of analyzing, investigating, or evaluating issues arising under this Agreement. The term "Affiliate" shall mean any person or entity controlling, controlled by, or under common control with a party.

15.2 **Return of Information.** All documents, data, or information furnished by either party is the sole property of that party. Upon the expiration of this Agreement and any extensions thereof, those documents, data, or information shall be returned to its owner if readily available

15.3   **Press Releases/Use of Name**   Neither party may make any news release, public announcement, denial or confirmation concerning all or any part of this Agreement or use the other's name in sales or advertising materials, or in any manner advertise or publish the fact that the companies have entered into this Agreement, or disclose any of the details of this Agreement to any third party, including the press, without the prior written consent of the other party, except such disclosures required by law, or the rules and regulations of the relevant government agencies.

**ARTICLE XVI**
**DEFAULT**

16.1   **Notice and Cure**.  Neither party shall be in default under this Agreement unless and until the other party shall have given the defaulting party written notice of such default and the defaulting party shall have failed to cure the default within thirty (30) days after written receipt of such notice; provided, however, that where a default cannot be reasonably cured within the thirty (30) day period, if the defaulting party shall promptly proceed to cure the default with due diligence, the time for curing the default shall be extended for a period of up to ninety (90) days from the date of receipt of the default notice.

16.2   **Additional Events of Default**.  An event of default shall also be deemed to have occurred if a party becomes insolvent, or institutes or has instituted against it bankruptcy proceedings which are not dismissed within ninety (90) days of filing, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency.

16.3   **Failure to Cure**.  Upon the failure by the defaulting party to timely cure any default after notice thereof from the non-defaulting party, the non-defaulting party may pursue one or more of the following remedies: a) take such actions as it determines, in its sole discretion, to correct the default and recover reasonable costs incurred in such curing; b) suspend performance under this Agreement, including the maintenance, relocations, and any separate collocation services provided pursuant to a separate agreement in connection with the lighting of the IRU Fibers; and c) pursue any legal remedies it may have under applicable law or principles of equity relating to such default, including an action for damages, specific performance and/or injunctive relief.

16.4   **Equitable Relief**.  The parties acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that each party shall be entitled to injunctive or similar preliminary relief to prevent or cure breaches of the provisions of this Agreement by the other and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they may otherwise be entitled to hereunder by law or equity.

**ARTICLE XVII**
**NOTICES**

**26**
**EXHIBIT 1**

17.1   **Notice Address.**   Unless otherwise provided herein, all notices and communications concerning this Agreement shall be in writing and addressed as follows:

If to Freedom:

> Freedom Telecommunications, Inc.
> 4505 Glencoe Avenue
> Marina del Rey, CA 90292

If to 360networks:

> 360networks (USA) inc.
> 370 Interlocken Blvd., Suite 600
> Broomfield, CO 80021
> Attn: Legal Department

With a copy to:

> 360networks (USA) inc.
> 130 North Main Street
> Butte, MT 59701
> Attn: Operations

17.2   **Manner of Giving Notice.**   Unless otherwise provided herein, notices shall be sent by certified U.S. Mail, return receipt requested, or by commercial overnight delivery service which provides acknowledgement of delivery and shall be deemed delivered: if sent by U.S. Mail, five (5) days after deposit, or if sent by commercial overnight delivery service, upon verification of receipt.

## ARTICLE XVIII
## ASSIGNMENT, SUCCESSION

18.1   **Assignment.**   The Parties may assign this Agreement without consent to a wholly-owned subsidiary or affiliate, or to an entity that acquires a controlling interest in FREEDOM or 360networks or to a company into which or with which a Party is merged. Any other assignment requires the written consent of the non-assigning Party. The non-assigning Party will have the right to withhold consent, if in its judgment reasonably exercised, the proposed assignee cannot adequately assume the obligations of this Agreement. In no event will any assignment by a Party be permitted without the delivery to the other Party of a binding agreement in writing from the proposed assignee that (i) states that the proposed assignee will assume all current, future and outstanding past obligations under this Agreement as if such assignee had originally executed this Agreement and (ii) evidence satisfactory to the non-assigning Party that the proposed assignee has insurance coverage similar to that described in Article XIII or other assurances that the proposed assignee can adequately perform the obligations it would assume under this

Agreement. Notwithstanding the foregoing, neither Party may sell, lease, sublease, IRU, transfer or otherwise dispose of the IRU Fibers to any person, partnership, corporation, limited liability company or any other entity except in conjunction with a permitted assignment of the Agreement.

A sale of telecommunications service or capacity on the Exchange System shall not be considered an assignment for purposes of this Article.

## ARTICLE XIX
## GOVERNING LAW

This Agreement shall be interpreted and construed in accordance with the laws of the state of Colorado without regard to its conflict of laws principles. The Parties agree that all actions and proceedings arising out of or related to this Agreement, will be brought in the United States District Court for the District of Central California in Los Angeles. Each Party agrees to personal jurisdiction in such court.

## ARTICLE XX
## NOT A PARTNERSHIP

The parties agree that this Agreement does not create a partnership or a joint venture

## ARTICLE XXI
## DISPUTE RESOLUTION

22.1  **Forum**.  It is the parties' intent that any disputes, which may arise between them, or between the employees of each of them, be resolved as quickly as possible. Quick resolution may, in certain circumstances, involve immediate decisions made by the parties' representatives. When such resolution is not possible and depending upon the nature of the dispute, the parties hereto agree to resolve such disputes in accordance with the provisions of this Article. However, the informal dispute resolution process set forth herein shall not be binding upon any party with respect to requests for preliminary injunctions, temporary restraining orders, specific performance or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute.

22.2  **Procedure**.  Each party shall each designate, by separate letter, representatives as points of contact and decision making with respect to the obligations and rights of the parties. Any disputed issues arising during the Term of this Agreement shall in all instances be initially referred to the parties' designated representatives. The parties' designated representatives shall render a mutually agreeable resolution of the disputed issue, in writing, within ten (10) business days of such referral  Either party may modify the designated representative upon written notice to the other party.

22.3   **Additional Remedies.** In the event that any claims or disputes arising under the terms and provisions of this Agreement cannot be resolved within the ten (10) business day time period, the parties, subject to the limitations contained in this Agreement, may seek any remedy available at law or equity.

22.4   **Attorney Fees.** The prevailing Party in any lawsuit will be entitled to reasonable legal fees and costs   If the prevailing Party rejected a written settlement offer that exceeds its recovery, the offering Party will be entitled to its reasonable legal fees and costs.

### ARTICLE XXII
### ACKNOWLEDGEMENT REGARDING USE AND ENCUMBRANCES

The IRU Grantee agrees and acknowledges that it has no right to use any of the IRU Grantor's Fibers, other than the IRU Fibers conveyed herein, and shall keep IRU Grantor's Cable and Fibers, other than the IRU Fibers, free from any liens, rights or claims of any third parties unless such liens, right or claims have resulted from the actions or inactions of the IRU Grantor

### ARTICLE XXIII
### OPERATIONS

23.1   **Responsibility for Operations**  Subject to the provisions of this Agreement, each party shall have responsibility for determining any Network and service configurations or designs, routing configurations, rearrangement or consolidation of channels or circuits and all related function with regard to the use of that party's IRU Fibers.

23.2   **Responsibility for Optronics.** Each party acknowledges and agrees that the other party is not supplying nor is obligated to supply to the other any optronics or electronics or optical or electrical equipment, all of which are the sole responsibility of an IRU Grantee; nor is either party responsible for performing any work other than as specified in this Agreement or for providing other facilities, including, without limitation, generators, batteries, air conditioners, fire protection, and monitoring and testing equipment, unless specifically otherwise agreed in writing.

### ARTICLE XXIV
### RIGHTS

As of the date hereof and to the best of its knowledge, each party or one of its Affiliates has, with respect to each IRU Segment to be delivered hereunder, obtained the Rights that were necessary for the use of its Cable and the IRU Fibers conveyed to the other party.  It is expressly understood that the rights and obligations under this Agreement are conditioned upon and shall in all respects be subject to the continuation of such Rights. Each party shall use commercially reasonable efforts to cause such Rights to remain effective through the Term of this Agreement. It is understood that the IRUs granted hereunder are subject to the terms of the Rights, and subject to the terms under which the right of way is owned or held by the grantor of the Rights, including, but not limited to, covenants, conditions, restrictions, easements, reversionary interests, bonds, mortgages and indentures, and other matters, whether or not of record, and to

Page 16 of 35

the rights of tenants and licensees in possession. The IRUs granted hereunder are further subject and subordinate to the prior right of the grantor of the Rights to use the right of way for other business activities, including railroad operations, telecommunications uses, pipeline operations or any other purposes. The Rights granted herein are expressly made subject to each and every limitation, restriction or reservation affecting the Rights. Nothing herein shall be construed as to be a representation, warranty or covenant of any right, title or interest with respect to the Rights.

## ARTICLE XXV
## OPTION FIBERS

Intentionally Deleted.

## ARTICLE XXVI
## MISCELLANEOUS

26.1   **Headings**.  The headings of the Articles in this Agreement are strictly for convenience and shall not in any way be construed as amplifying or limiting any of the terms, provisions or conditions of this Agreement.

26.2   **Construction**   In construction of this Agreement, words used in the singular shall include the plural and the plural the singular, and "or" is used in the inclusive sense, in all cases where such meanings would be appropriate.

265 3   **Severability**.   No provision of this Agreement shall be interpreted to require any unlawful action by either party. If any Article or clause of this Agreement is held to be invalid or unenforceable, then the meaning of that Article or clause shall be construed so as to render it enforceable to the extent feasible. If no feasible interpretation would save the section or clause, it shall be severed from this Agreement with respect to the matter in question, and the remainder of the Agreement shall remain in full force and effect. However, in the event such Article or clause is an essential element of the Agreement, the parties shall promptly negotiate a replacement section or clause that will achieve the intent of such unenforceable section or clause to the extent permitted by law.

26.4   **Entire Agreement; Amendment**.  This Agreement, and any Exhibits referenced and attached hereto or to be attached hereto, constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersede any and all prior negotiations, understandings and agreements with respect hereto, whether oral or written. This Agreement may be amended only by a written instrument executed by the party against whom enforcement of the modification is sought.

26.5   **Non-Waiver**.  No failure to exercise and no delay in exercising, on the part of either party hereto, any right, power or privilege hereunder shall operate as a waiver hereof, except as expressly provided herein.  Any waiver by either party of a breach of any provision of this Agreement shall not be deemed to be a waiver of any other or subsequent breach and shall not be

construed to be a modification of the terms of this Agreement unless and until agreed to in writing by both parties

26.6   **Performance**   All actions, activities, consents, approvals and other undertakings of the parties in this Agreement shall be performed in a reasonable and timely manner

26.7   **Well Known Meanings**.   Unless expressly defined herein, words having well known technical or trade meanings shall be so construed.

26.8   **Counterparts**.   This Agreement may be executed simultaneously, including via facsimile, in one or more counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument

26.9   **Conflicts.**   In the event of a conflict or difference between the provisions of this Agreement and those of **Exhibit A-1 or Exhibit A-2**, attached hereto at a later date pursuant to Article 1, the provisions of such **Exhibit A-1 or Exhibit A-2** shall prevail.  If there is a conflict or difference between this Agreement and other Exhibits, this Agreement shall prevail.

**IN WITNESS WHEREOF**, the parties hereto have executed this IRU Agreement as of the date first written above.

**360networks (USA) inc**

By: _____

Title: _VP, Operations_

**Freedom Telecommunications, Inc.**

By: _____

Title: _CEO_

**EXHIBITS** (all incorporated by reference in this Agreement):

A-1 and 2:    IRU Fiber Details, Route Maps, and Material Terms.

| | |
|---|---|
| B: | Splicing, Testing and Acceptance Standards |
| C: | Acceptance/Rejection Notice |
| D: | Maintenance and Call Out List |
| E: | Routine Maintenance Standards |

**32**
**EXHIBIT 1**

## EXHIBIT A-1

**Description of Fiber Segments offered by FREEDOM to 360networks:**

Maps/Diagrams depicting each route, except for the future Los Angeles Segment are attached to this Exhibit A1.

### Segment 1 (Approximately .2 Route Miles)

12 fibers on the lateral from the VZW Inland MTSO located at 5351 Airport Dr, Ontario, CA to new 360networks Interconnection Manhole located on E Airport Dr. approximately 300' E/O Wineville Ave.



### Segment 2 (Approximately 5.7 Route Miles)

**33**
**EXHIBIT 1**

8 fibers on the lateral from the VZW Azusa MTSO located at 939 N Vernon, Azusa, CA 91702 (aka "Eastern Lateral") to a new Interconnection Manhole in proximity to 360networks Manhole 11E located adjacent to Badillo St and Rimsdale Ave.



**Segment 3 (Approximately 25 Route Miles)**

2 fibers on the lateral from the VZW Azusa MISO located at 939 N Vernon, Azusa, CA 91702 (aka "Western Lateral") to a new Interconnection Manhole adjacent to 360networks Manhole 15W at Mission & Rosenda Ave.



**35**
**EXHIBIT 1**

**Segment 4 (Approximately 86.2 Route Miles)**

6 Fibers on the Segment from the VZW Tustin MTSO, located at 2792 Walnut Ave, Tustin, CA. 92780, diversely in and out of the VZW Vista MTSO, located at 2430 Business Park Dr, Vista, CA 92081 to 360networks Manhole 164 located on S. Juniper at E. 4th Ave.

This Segment is made up of 7 sections. FTI owns the fiber cable in 4 sections (depicted in red in the graphic below) and has 3rd party fiber lease agreements in the other 3 sections (depicted in blue in the graphic below). Segment breakdown as follows:

**Section 1 (FTI Owned):** Tustin MTSO to AT&T Manhole on Bonita Canyon Dr, 850' E/O MacArthur Blvd (11.5 miles)
**Section 2 (3rd Party Lease):** AT&T Manhole on Bonita Canyon Dr, 850' E/O MacArthur Blvd to AT&T Manhole on Golden Lantern & PCH (20 miles)
**Section 3 (FTI Owned):** AT&T Manhole on Golden Lantern & PCH to AT&T Manhole on El Camino Real at Carlsbad Village Dr. (35.4 miles)
**Section 4 (3rd Party Lease):** AT&T Manhole on El Camino Real at Carlsbad Village Dr. to AT&T Manhole on El Camino Real and Faraday Ave (4.1 miles)
**Section 5 (FTI Owned):** AT&T Manhole on El Camino Real and Faraday Ave. to the VZW Vista MTSO located at 2430 Business Park Dr, Vista, CA 92081 (3.2 miles)
**Section 6 (FTI Owned):** Vista MTSO to AT&T Manhole on E. Mission Rd at Mulberry Dr. (7.2 miles)
**Section 7 (3rd Party Lease):** AT&T Manhole on E. Mission Rd at Mulberry Dr. to 360 Interconnect Manhole on S. Juniper St at E. 4th Ave. (4.8 miles)

In sections 1, 3, 5 & 6 360networks will not incur any costs for the 6 fibers owned by FTI (Approximately 57.3 Route Miles)

In sections 2, 4 & 7 FTI will pass through to 360networks the 3rd party lease cost of $50/fiber mile/month (Approximately 28.9 Route Miles) for up to six fibers when and if 360networks chooses to utilize the fibers in these segments. For the avoidance of doubt, 360networks shall pay the 3rd party lease cost only for fibers used and only for the time period that fibers are in use by 360networks.



If Freedom constructs its own system in any of the blue sections, or otherwise acquires an ownership interest in any of the blue sections, then upon such occurrence(s), and without payment of additional money or other consideration, 360 shall immediately possess an IRU in six (6) of the fibers in the blue section(s) pursuant to the terms of this Agreement. Freedom shall promptly notify 360 of any such occurrence and specifically designate the six (6) IRU fibers. The Parties shall follow the procedures set forth in Article III for testing and acceptance of the fibers. Once 360 migrates from the leased fibers to the IRU fibers in the red section(s), the lease, if any, shall automatically terminate without penalty or liability for either party.

- Future Los Angeles Segment

  Freedom is planning a future build or acquisition that will extend from approximately 2792 Walnut Avenue, Tustin, California to approximately the One Wilshire Building in Los Angeles ("the Los Angeles Segment")  If and when Freedom acquires the Los Angeles Segment with comparable fiber counts to the Ontario to Los Angeles Segment, 360 shall immediately possess an IRU in six (6) of the fibers in the Los Angeles Segment pursuant to the terms of this Agreement, without payment of any additional IRU fee or other consideration. Freedom shall promptly notify 360 upon completion or acquisition of the Los Angeles Segment and shall specifically designate the six (6) IRU fibers. The Parties shall follow the procedures set forth in Article III for testing and acceptance of these fibers. For clarity, the Parties understand and agree that while Freedom anticipates

installation of the Los Angeles Segment, this Agreement does not impose any obligation on Freedom to install or otherwise acquire the Los Angeles Segment.

**38**
**EXHIBIT 1**

## Segment 5

An innerduct/maxcell pathway from the 360network Manhole 202 to the Castle Access "Meet Me" Vault depicted in red in the graphic below. From the "Meet Me" Vault Castle Access has conduit structure populated with maxcell available to the "Meet Me" Room inside the Data Center for fiber termination.



**Access Points:**

Existing Splice locations or other mutually agreed upon Access Points and Interconnection Manhole locations.
Manholes identified in the attached maps in Exhibit A1, manholes in the vicinity of the yellow push pins shown in the attached maps in Exhibit A1.
Manholes in the vicinity of the transition points listed for Segment 4 above

**Special Provisions:**

1.     Collocation in IRU Grantor facilities is subject to Article IV of the Agreement, and subject to availability. No provision set forth in this is Exhibit is intended to guarantee collocation space. Additional charges may apply, including charges for equipment, labor and any other make ready charges (both MRC/NRC), and charges associated with accessing fibers. Any splicing or jumpering through intermediate IRU Grantor POP sites will be subject to additional charges. In the event that IRU Grantor, in its discretion, decommissions any collocation site, IRU Grantor will not be responsible for any costs associated with removal or relocation of the IRU Grantee's facilities or the IRU Fibers.

2.     IRU Grantee will provide splicing configurations at least 45 days in advance of the requested delivery date.

3.     IRU Grantee is responsible for all costs/coordination associated with tie cable interconnection at IRU Grantor Access Points. In the event the of the installation of a new Interconnection Manhole, IRU Grantor shall own the new Interconnection Manhole and all fibers connecting Grantor's backbone Cable to the Interconnection Manhole subject to Grantee's interest in the IRU Fibers. Grantee shall be responsible for all costs associated with the installation of the Interconnection Manhole and connecting fibers. If special provisions are required (i.e. building interconnection to a meet me room), IRU Grantee will incur additional costs with providing access. IRU Grantor will provide access up to the FDP. IRU Grantee is responsible for running the pre-connectorized tie cable to IRU Grantor. IRU Grantor will then provide the cable termination services. If IRU Grantor provides any cross connects for the IRU Grantee, standard rates of $250 per pair MRC and standard NRC shall apply unless other rates are agreed to in writing by the parties.

**EXHIBIT 1**

## EXHIBIT A-2

**Description of Fibers Supplied by 360networks to FREEDOM:**

**(Approximately 102.7 Route Miles)**

12 Fibers on the Segment from the 360networks POP or Interconnection Manhole located at 780 S  Milliken Ave, Ontario, CA to Interconnection Manhole located at outside the 360networks Palmdale site at 2010 East Q, Palmdale, CA.

4 Fibers on the Segment from the Interconnection Manhole located at the 360networks Palmdale site at 2010 East Q, Palmdale, CA to the 360networks POP or Interconnection Manhole located at 1025 18th St, Bakersfield, CA



**Access Points:**

Existing Splice Point located at/near Avenue M in Lancaster, or west of Highway 14/138 along 20th St between Avenue N and O
Existing Splice Points or other mutually agreed upon Access Points or Interconnection Manholes
Interconnection Manhole at 1025 18th St, Bakersfield, CA
Interconnection Manhole at 2010 East Q, Palmdale, CA
Interconnection Manhole at sta 18+32 near 780 S Miliken, Ontario, CA
Interconnection Manhole (adjacent to Manhole 141) on Airport Road, Ontario, CA

**Special Provisions:**

1     Collocation in IRU Grantor facilities is subject to Article IV of the Agreement, and subject to availability  No provision set forth in this is Exhibit is intended to guarantee collocation space.  Additional charges may apply, including charges for equipment, labor and any other make ready charges (both MRC/NRC), and charges associated with accessing fibers. Any splicing or jumpering through intermediate IRU Grantor POP sites will be subject to additional charges  In the event that IRU Grantor, in its discretion, decommissions any collocation site, IRU Grantor will not be responsible for any costs associated with removal or relocation of the IRU Grantee's facilities or the IRU Fibers.

2.     IRU Grantee will provide splicing configurations at least 45 days in advance of the requested delivery date

3.     IRU Grantee is responsible for all costs/coordination associated with tie cable interconnection at IRU Access Points.   In the event the of the installation of a new Interconnection Manhole, IRU Grantor shall own the new Interconnection Manhole and all fibers connecting Grantor's backbone Cable to the Interconnection Manhole subject to Grantee's interest in the IRU Fibers.  IRU Grantee shall be responsible for all costs associated with the installation of the Interconnection Manhole and connecting fibers.   If special provisions are required (i.e. building interconnection to a meet me room), IRU Grantee will incur additional costs with providing access.  IRU Grantor will provide access up to the FDP.  IRU Grantee is responsible for running the pre-connectorized tie cable to IRU Grantor.  IRU Grantor will then provide the cable termination services. If IRU Grantor provides any cross connects for the IRU Grantee, standard rates of $250 00 per pair MRC and standard NRC shall apply unless other rates are agreed to in writing by the Parties.

**EXHIBIT 1**

## EXHIBIT B

### Fiber Specifications / Acceptance Testing

IRU Grantor will perform fiber testing as described below on each IRU Fiber and will provide the test results (hard copy diskette or CD) to the IRU Grantee  Each "span" will be defined in documentation included in the IRU Grantee's test results package.  Acceptance of a span by IRU Grantee shall be an acknowledgement by the IRU Grantee that all IRU Fibers comply with all performance criteria contained herein.

A. **Power testing:** End to end power loss measurement will be conducted for each IRU Fiber in the span and from both directions using an industry-accepted laser source and power meter. Power loss measurements will be conducted at both 1310 nm and 1550 nm for Standard Single Mode Fiber; Dispersion Shifted Fiber (True Wave™, LEAF™, etc ) will be tested at 1550 nm only.  In the event that a span consists of both Standard Single Mode and Dispersion Shifted fiber types, only 1550 nm testing will be conducted.  Power loss readings from each span will be provided in softcopy form in the LinkLoss Application format.  The power loss readings shall include the test site's location A and B, both uni-directional power loss reading from A to B and from B to A for each fiber and the average readings of A to B and B to A (to determine the end-to-end loss of span).  This power testing will ensure that the end-to-end loss readings for each fiber in a span are below the maximum-engineered loss for that span and verify fiber continuity.

B. **OTDR testing:** All traces will be provided in softcopy form using either the GN Nettest Networks and/or the GR 196 format.  This testing will be conducted at the 1550 nm wavelength OTDR testing will be conducted on a bi-directional basis for each Fiber in each span at the appropriate wavelength for the IRU Fiber described above.  However, if due to length or attenuation reasons that the IRU Fiber span exceeds the dynamic range of an OTDR, a portion of the IRU Fiber span may be divided into shorter testing spans, to the extent reasonably possible, in order to obtain bi-directional analysis.  In circumstances where the IRU Grantee intends to accept IRU Fiber that is not terminated at one end in a fiber distribution panel, (such as in a manhole or handhole), fibers shall be tested as well from the un-terminated side using a bare fiber adapter.

C. **Acceptance:** The turnover documentation package delivered to IRU Grantee will contain a bi-directional splice loss report and a fiber acceptance report (containing the average bi-directional splice loss for all the splices in the span)  All splice loss shall be measured using the 1550nm wavelength. The objective for each fiber within a span shall be an average bi-directional loss of 0.15 dB or less for each splice  For example, if a given span has ten (10) splices, each fiber shall have a total bi-directional loss (due to the ten (10) splices) of 1.5 dB or less  Individual bi-directional loss values for each splice will be reviewed for high losses, which may indicate splice instability. The aforementioned standards are objectives, not the basis for acceptance.  The acceptance standard for each fiber shall be an average bi-directional installed loss of 0.25 dB/km or less across each span, based upon the end to end power loss measurements described in Section A above.

## EXHIBIT C

### ACCEPTANCE/REJECTION NOTICE

### Check one box:

❑ IRU Fiber Accepted (fill in acceptance statement below)

Pursuant to Article III of the Reciprocal IRU Agreement between FREEDOM and 360networks, dated _____, _____ hereby Accepts its IRU Fibers as defined in Exhibit A- ___ for the Segment described as

_____

❑ IRU Fiber Rejected (fill in reason statement below)

### Reason for Rejection:

Name: _____

Signature: _____

Title: _____

Company: _____

Date: _____

### EXHIBIT D

Page 31 of 35

**44**
**EXHIBIT 1**

## MAINTENANCE AND CALL OUT LIST

Upon the IRU Grantor _____ (_____) receiving a trouble report from IRU Grantee, IRU Grantor will dispatch qualified personnel to the location of the outage within four (4) hours. At the same time, the IRU Grantor Operations Manager and/or Outside Plant Network Manager will be notified to assist in isolating the problem. If IRU Grantee requests further escalations, it will contact the Network Management Center who will escalate as follows:

**For FREEDOM:**

NOC:

**For 360networks:**

NOC: 1-800-609-1025
Change Management: US360CMC@360.net

**45**
**EXHIBIT 1**

## EXHIBIT E

### Maintenance Specifications and Procedures

Any party responsible for providing maintenance of the Cable shall be referred to herein as the "Service Provider". The Party receiving maintenance services from the Service Provider hereunder shall be referred to herein as the "Service Recipient". All other capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Agreement of which this Exhibit forms a part

1.    MAINTENANCE.

(a)    Scheduled Maintenance. Routine maintenance and repair of the Cable shall be performed by or under the direction of Service Provider, at Service Provider's reasonable discretion or at Service Recipient's reasonable request. Scheduled Maintenance shall commence upon the Acceptance Date of the Agreement Scheduled Maintenance shall include the following activities:

(i)    Patrol of Network route on a reasonable routine basis;

(ii)    Maintenance of a "Call-Before-You-Dig" program and all required and related cable locates;

(iii)    Maintenance of sign posts along the Network right-of-way;

(iv)    Assignment of fiber maintenance employees to locations along the Network at intervals dependent upon terrain, accessibility, locate ticket volume, etc Service Provider shall decide the staffing of fiber maintenance employees for the Network; and

(v)    Service Provider shall have qualified representatives on site any time Service Provider has reasonable advance knowledge that another person or entity is engaging in construction activities or otherwise excavating within five (5) feet of the Cable.

(b)    Unscheduled Maintenance. Non-routine maintenance and repair of the Cable, which is not included as Scheduled Maintenance, shall be performed by or under the direction of Service Provider.    Unscheduled Maintenance shall commence upon the Acceptance Date of the Agreement. Unscheduled Maintenance shall consist of:

(i)    "Emergency Unscheduled Maintenance" in response to an alarm identification by Service Provider's Operations Center, notification by Service Recipient or notification by any third party of any failure, interruption or impairment in the operation of the Network, or any event imminently likely to cause the failure, interruption or impairment in the operation of the Network.

(ii)    "Non-Emergency Unscheduled Maintenance" in response to any potential service-affecting situation to prevent any failure, interruption or impairment in the operation of the Network.

**46**
**EXHIBIT 1**

Service Recipient shall immediately report the need for Unscheduled Maintenance to Service Provider in accordance with procedures promulgated by Service Provider from time to time. Service Provider will log the time of Service Recipient's report, verify the problem and dispatch personnel immediately to take corrective action.

2.      OPERATIONS CENTER.  Service Provider shall operate and maintain an Operations Center ("OC") capable of receiving alarms twenty-four (24) hours a day, seven (7) days a week. Service Provider's maintenance employees shall be available for dispatch twenty-four (24) hours a day, seven (7) days a week  Service Provider shall have its first maintenance employee at the site requiring Emergency Unscheduled Maintenance activity within four (4) hours after the time Service Provider becomes aware of an event requiring Emergency Unscheduled Maintenance, unless delayed by circumstances beyond the reasonable control of Service Provider. Service Provider shall maintain a toll-free telephone number to contact personnel at the OC. Service Provider's OC personnel shall dispatch maintenance and repair personnel to handle and repair problems detected in the Network.

3.      COOPERATION AND COORDINATION.

(a)      Service Recipient shall utilize an Escalation List, as updated from time to time, to report and seek immediate action on exceptions noted in the performance of Service Provider in meeting maintenance service objectives.

(b)      Service Recipient will, as necessary, arrange for unescorted access for Service Provider to all sites of the Lessor System, subject to applicable contractual, underlying real property and other third-party limitations and restrictions.

(c)      In performing its services hereunder, Service Provider shall take workmanlike care to prevent impairment to the signal continuity and performance of the Network. The precautions to be taken by Service Provider shall include notifications to Service Recipient.  In addition, Service Provider shall reasonably cooperate with Service Recipient in sharing information and analyzing the disturbances regarding the Cable and/or Fibers. In the event that any Scheduled or Unscheduled Maintenance hereunder requires a traffic roll or reconfiguration involving cable, fiber, electronic equipment, or regeneration or other facilities of the Service Recipient, then Service Recipient shall, at Service Provider's reasonable request, make such personnel of Service Recipient available as may be necessary in order to accomplish such maintenance, which personnel shall coordinate and cooperate with Service Provider in performing such maintenance as required of Service Provider hereunder.

(d)      Service Provider shall notify Service Recipient at least ten (10) days prior to the date in connection with any Maintenance Window of any Scheduled Maintenance and as soon as possible after becoming aware of the need for Unscheduled Maintenance. Service Recipient shall have the right to be present during the performance of any Scheduled Maintenance or Unscheduled Maintenance so long as this requirement does not interfere with Service Provider's ability to perform its obligations under this Agreement. In the event that Scheduled Maintenance is canceled or delayed for whatever reason as previously notified, Service Provider shall notify

Service Recipient at Service Provider's earliest opportunity, and will comply with the provisions of this Section.

(e)     Within 72 hours following any Unscheduled Maintenance, Service Provider shall provide Service Recipient with a report detailing the reason(s) for any such Unscheduled Maintenance with a duration equal to or greater than four (4) hours.

4     FACILITIES.

(a)     Service Provider shall maintain the Network in a manner, which will permit Service Recipient's use. All common systems within facilities along the Lessor System shall be maintained in accordance with manufacturer's specifications, to include battery plants, generators, and HVAC units.

(b)     Except to the extent otherwise expressly provided in the Agreement, Service Recipient will be solely responsible for providing and paying for any and all maintenance of all electronic, optronic and other equipment, materials and facilities used by Service Recipient in connection with the operation of their dark fibers, none of which is included in the maintenance services to be provided hereunder.

5     FIBER OPTIC CABLE/FIBERS.

(a)     Service Provider shall perform appropriate testing on the Cable contained in the Network in accordance with Service Provider's then current preventative maintenance procedures as agreed to by Service Recipient, which shall not substantially deviate from standard industry practice

(b)     Service Provider shall maintain sufficient capability to teleconference with Service Recipient during Emergency Unscheduled Maintenance in order to provide regular communications during the restoration process. When correcting or repairing fiber optic cable discontinuity or damage, including but not limited to, an event of Emergency Unscheduled Maintenance, Service Provider shall use reasonable efforts to arrive on site within four (4) hours of learning of traffic-affecting discontinuity and effect repair of first fiber within six (6) hours after the Service Provider maintenance employee's arrival at the problem site. In order to accomplish such objective, it is acknowledged that the repairs so effected may be temporary in nature. In such event, within twenty-four (24) hours after completion of any such Emergency Unscheduled Maintenance, Service Provider shall commence its planning for permanent repair, and thereafter promptly shall notify Service Recipient of such plans, and shall implement such permanent repair within an appropriate time thereafter. Restoration of open fibers on fiber strands not immediately required for service shall be completed on a mutually agreed-upon schedule

(c)     During restoration, the parties agree to work together to restore all traffic as quickly as possible. Service Provider, promptly upon arriving on the site of the cut, shall determine the course of action to be taken to restore the Cable and shall begin restoration efforts. Service

Provider shall splice fibers tube by tube or ribbon by ribbon in a logical order with consideration to all lit fibers within the Cable.

(d)     In performing permanent repairs, including the repair of microbends and splice work, Service Provider shall comply with the splicing specifications as set forth in Exhibit B, and shall take all reasonable steps to ensure that attenuation across the zone of repair satisfies the specifications in Exhibit B. Service Provider shall provide to Service Recipient any modifications to these specifications as may be necessary or appropriate in any particular instance for Service Recipient's approval, which approval shall not be unreasonably withheld.

(e)     Service Provider's representatives that are responsible for initial restoration of a cut fiber optic cable shall carry on their vehicles the typical appropriate equipment that would enable a temporary splice, with the objective of restoring operating capability in as little time as possible. Service Provider shall maintain and supply an inventory of spare fiber optic cable in storage facilities supplied and maintained by Service Provider at strategic locations to facilitate timely restoration.

6.     MAINTENANCE WINDOW (MW)   Scheduled Maintenance, which is reasonably expected to produce any signal discontinuity, must be coordinated between the parties. Generally, this work should be scheduled between 2200 and 0600 Central Time Monday through Friday. Major system work, such as fiber rolls and hot cuts, will be scheduled for MW weekends and shall allow work during daylight hours if on a Saturday or Sunday. Service Provider and Service Recipient will agree upon a MW calendar. The intent is to avoid jeopardy work on high-traffic holidays.

7.     SUBCONTRACTING.   Service Provider may subcontract any of the maintenance services hereunder; provided that Service Provider shall require the subcontractor(s) to perform in accordance with the requirements and procedures set forth herein. The use any such subcontractor shall not relieve Service Provider of any of its obligations hereunder.

**[END OF PAGE]**

**EXHIBIT 1**

# Caldwell Leslie

Caldwell Leslie & Proctor, PC

725 South Figueroa Street, 31st Floor  Los Angeles, CA  90017-5524   Tel 213.629.9040   Fax 213.629.9022   www.caldwell-leslie.com

**BY EMAIL AND
HAND DELIVERY**

**DAVID K. WILLINGHAM**
willingham@caldwell-leslie.com

November 30, 2012

Nathan M. Spatz
Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406

Re:    *360networks (USA), Inc. v. Freedom Telecomms., Inc.*, Case No. CV-12-1831-JEM

Dear Nathan:

We write in response to your letter of November 20, 2012.  First, we're pleased to see
that 360networks (USA), Inc. ("360networks") has finally agreed to honor and complete
our long-pending request to complete certain splicing work at manholes 68 and 141 as
required under the Reciprocal Indefeasible Right of Use Agreement (the "IRU
Agreement" or the "Agreement").  Business representatives from Freedom
Telecommunications, Inc. ("Freedom") will be in touch directly with the 360networks
representative listed on the Service Order Form, although we will certainly follow up
with you as needed regarding that work.

Second, your denial of Freedom's requested splice work at manholes 87, 95, 119, and 128
is based on your misreading of the IRU Agreement and its exhibits.  All of those
locations <u>are</u> designated "Access Points" because they are "Existing Splice Points or
other mutually agreed upon Access Points or Interconnection Manholes" pursuant to
Exhibit A-2 of the IRU Agreement.  In fact, 360networks cannot dispute that, at the time
of the IRU Agreement, 360networks provided Freedom with a Google Maps graphic
depicting 360networks' "Existing splice locations."  That graphic expressly depicted the
<u>same</u> splicing locations—manholes 87, 95, 119, and 128—that you now seek to
characterize as "new access points."  (Attached hereto as Exhibit 1.)

Accordingly, we again ask that you approve the splicing and related work at manholes 87,
95, 119, and 128 that we have now requested several times.  The requested work has
become critically time-sensitive, and Freedom will suffer irreparable damage if the work
is not immediately scheduled and then completed in a timely fashion.

If you refuse to honor our requests, please let us know immediately.  We are not
interested in engaging in a drawn-out correspondence with you about this issue, only to





EXHIBIT 2

November 30, 2012
Page 2

be ultimately rejected.  We expect a prompt response, by no later than close of business on Monday, December 3, 2012.

Thank you for your attention to this matter.

Sincerely,

DAVID K. WILLINGHAM

Exhibit 1



# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV12- 10509 DSF (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

#### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
David K. Willingham, State Bar No. 198874
CALDWELL LESLIE & PROCTOR, PC
725 S. Figueroa St., 31st Floor
Los Angeles, CA  90017  Tel. (213) 629-9040

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FREEDOM TELECOMMUNICATIONS, INC., a
California corporation

PLAINTIFF(S)

v.

360NETWORKS, INC., a Nevada corporation

USA

DEFENDANT(S).

CASE NUMBER

CV12-10509 DSF (AGRc)

## SUMMONS

TO:   DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _David K. Willingham_____, whose address is _Caldwell Leslie & Proctor, PC, 725 S. Figueroa St., 31st Floor, Los Angeles, CA 90017_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___DEC - 7 2012_____

By: ____SHEA BOURGEOIS_____
          Deputy Clerk

(Seal of the Court)

1184

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
FREEDOM TELECOMMUNICATIONS, INC., a California corporation

**DEFENDANTS**
360NETWORKS, INC., a Nevada corporation

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

David K. Willingham, State Bar No. 198874
CALDWELL LESLIE & PROCTOR, PC
725 S. Figueroa Street, 31st Floor, Los Angeles, CA  90017  Tel. (213) 629-9040

Attorneys (If Known)

Michael J. Finnegan, Nathan Spatz
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 S. Figueroa St., Suite 2800, Los Angeles, CA  90017  Tel. (213) 488-7100

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify):

☐ 6 Multi-District Litigation

☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No       ☑ **MONEY DEMANDED IN COMPLAINT:** $ Declaratory Relief/$1 Million +

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1332(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☑ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV1210509

**FOR OFFICE USE ONLY:**  Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                         CIVIL COVER SHEET                         Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): 2:12-cv-01831-JEM

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑A. Arise from the same or closely related transactions, happenings, or events; or
☑B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Nevada |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date December 7, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |